UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,          :
                                   :
                                   :
          v.                       :        File No. 1:08-CR-35-5
                                   :
OKSANA MOLODTSOVA,                 :
                                   :

RULING ON DEFENDANT'S MOTIONS TO SUPPRESS AND
DEFENDANT'S MOTION TO SUPPLEMENT THE RECORD
(Papers 64, 109, and 170)

     Defendant Oksana Molodtsova is charged with conspiracy to

defraud the United States, in violation of 18 U.S.C. § 371.  She

moves to suppress evidence against her on various grounds.

Molodtsova filed her first Motion to Suppress on October 20,

2008.  Paper 64.  After changing attorneys, Molodtsova filed a

second Motion to Suppress on April 21, 2009, supplementing the

original motion.  Paper 109.  The government opposes both

motions.  Papers 77, 168.  A hearing was held on January 12,

2010.  Subsequent to the hearing, the parties submitted

additional memoranda.  Papers 171, 173.  Molodtsova also moved to

supplement the evidentiary record.  Paper 170.  For the reasons

set forth below, Molodtsova's motion to supplement the record is

granted and her motions to suppress are denied.

I.   Background

     The following facts are based on testimony and exhibits

received at the January 12, 2010 hearing.  Significant factual

disputes are noted and resolved to the extent necessary.  See
Fed. R. Cr. P. 12(d).

On December 12, 2007, Captain Eric Hamblin of the Ardmore,
Oklahoma Police Department received a call from an employee at
the Hampton Inn in Ardmore.  The employee reported two guests who
had a large amount of cash in a bag, were avoiding security
cameras in the Inn, and were not letting maids in their room.
The guests — a black male and a white female — were driving a
white Dodge Charger with a Massachusetts license plate, and
registered at the Inn under the names Isiah Williams and
Christina Baker.[1]  The employee voiced concern to Hamblin that
these guests could be bank robbers from the East, on their way to
Mexico.

Hamblin drove to the Hampton Inn, noted the vehicle license
plate number, and ran a records check on the car and the guests'
names.  Finding nothing, he drove to a nearby restaurant and
called the employee back, informing her of the results.  Hamblin
then called the Ardmore Police Department narcotics unit
requesting assistance; in addition to the possibility of bank
robbers, the large amount of cash suggested to Hamblin possible
drug activity.

---

[1] In fact, the individuals were Jovan Hibbert and Oksana
Molodtsova, co-defendants in this case.

After calling the narcotics unit, Hamblin drove back to the Hampton Inn.  The guests had just checked out of the Inn,[2] and as Hamblin arrived, the white Dodge Charger passed him traveling in the opposite direction.  Hamblin turned around in pursuit, but could not locate them.[3]  He informed the narcotics unit the suspects were moving, and instructed the officers to make contact and stop them.

Officer Keith Ingle, a canine officer with the Ardmore Police Department narcotics unit, spotted the white Dodge Charger shortly thereafter parked in front of the nearby Comfort Inn.  As Ingle approached in his unmarked Suburban, he observed a black male in the driver's seat and a white female entering the passenger seat with what appeared to be key cards to the motel. As the car started to pull out, Ingle activated his emergency

---

[2] At the January 12, 2010 hearing, Hamblin testified that the guests had been asked to leave the Inn because of their suspicious behavior.  Defendant Molodtsova testified they had left voluntarily, with the intent of switching to a cheaper hotel.  Notwithstanding Molodtsova's testimony, counsel for the defendant acknowledges she and Hibbert had been asked to leave. Paper 171 ¶ 4.

[3] According to Hamblin, the white Dodge Charger must have accelerated rapidly to escape from view in the short amount of time it took him to turn around and crest a small hill.  Viewing the suspects as having fled, Hamblin drove to the nearby interstate to search for them.  Molodtsova maintains she and co-defendant Hibbert simply drove around the corner to the Comfort Inn (located just a few hundred yards away) and did not speed off or evade Hamblin.

lights.  The car stopped, and Ingle got out of his vehicle and approached the driver's side of the car.

Ingle noted the driver was very nervous, sweating in the cool[4] December air and fidgeting.  He asked the driver and passenger for identification, and the passenger provided a Virginia driver's license identifying herself as Christina Baker. The driver identified himself as Isiah Williams, but stated he could not find his license, and asked permission to look for it in the trunk.  Ingle agreed, and the driver opened the trunk, revealing numerous high-end consumer goods such as purses and shoes.  As the driver looked for his license, Ingle observed the passenger reach into the back seat and close a black bag that appeared to have a large amount of cash, some of which was banded.  The driver could not find his license, so he wrote down his name and date of birth for Ingle, and returned to the driver's seat.  Ingle returned to his vehicle and ran a records check on the driver and passenger, finding nothing.

Hamblin arrived at the scene and took the driver aside for a brief conversation.  The driver had managed to find his license

---

[4] At the evidentiary hearing, Hamblin and Ingle testified December 12, 2007 was a cold day; one of them offered 25 degrees as an estimate.  Counsel for Molodtsova responds with a Motion to Supplement Record, pointing to an internet database indicating the high temperature for Ardmore, Oklahoma on that day was 46.4 degrees Fahrenheit.  Paper 170.  Because the government does not oppose it, the motion is granted and the Court acknowledges the temperature data offered by Molodtsova.

and provided it to Hamblin, along with an explanation that he was
from a wealthy family and was traveling with the woman either to
or from Miami.

Ingle ran his dog Ricki around the vehicle to check for
narcotics.  Ricki alerted on the first run, so Ingle searched the
passenger's compartment of the car.  Ingle found the bag filled
with cash, iPods, and a small amount of marijuana.  Because Ricki
had alerted strongly, Ingle thought there should have been more
narcotics than the small amount of marijuana, so he ran Ricki a
second time.  Ricki diverted from the car and alerted on the
black bag filled with cash, which was now sitting outside the
car.  The driver explained the money was not drug-related, but he
had smoked marijuana earlier.

As Ingle and Ricki checked the car, Hamblin spoke with the
passenger (Molodtsova).  The accounts of this conversation differ
somewhat.  Hamblin testified he informed Molodtsova she was not
required to speak with the police, and simply asked if she would
mind stepping into the hotel lobby to explain what was going on.
According to Hamblin, she agreed and spoke to him voluntarily.
Molodtsova testified that Hamblin knew she was not a U.S. citizen
and threatened her with deportation.  She claims he threatened
her by stating, "When we find the drugs, you'll never see your
parents again."  Molodtsova describes Hamblin as putting his cell
phone in her face, pointing to a number in his contacts list

5

labeled "FBI," and calling the number, telling her that she was
"done for" and would be deported.

In any event, Hamblin and Molodtsova spoke in the hotel
lobby, where she provided a story vaguely similar to that of the
driver.  She identified herself initially as Christina Baker, but
then admitted her real name was Oksana Molodtsova, and asked to
go to the police station to talk.  At this point, Hamblin
maintains he gave Molodtsova her <u>Miranda</u> warnings.  Molodtsova
denies hearing the <u>Miranda</u> warnings, and claims she did not agree
to waive her <u>Miranda</u> rights.

Hamblin drove Molodtsova to the Ardmore Police Department,
where they met Craig Overby, an FBI agent stationed in Ardmore.
The three sat down in Hamblin's office, where again the accounts
differ.  Hamblin and Overby testified that Hamblin gave
Molodtsova her <u>Miranda</u> warnings a second time, reading them off a
card on his desk.  According to Hamblin and Overby, Molodstova
acknowledged the warnings and agreed to talk.  Both officers
describe her as eager to cooperate and helpful.  Molodtsova
denies hearing the warnings or waiving her <u>Miranda</u> rights, and
maintains she was intimidated into talking.

All parties agree no written <u>Miranda</u> waiver was obtained.
Overby proceeded to interview Molodtsova, obtaining incriminating
statements and useful information.  After the interview, Hamblin
typed up a brief statement for Molodtsova, which she signed.

II.  <u>Discussion</u>

Molodtsova moves to suppress various types of evidence, arguing a combination of Fourth, Fifth, and Sixth Amendment violations.  The Court addresses each below.

A.   <u>Initial Stop of the Car and Occupants</u>

The Fourth Amendment requires police to have a reasonable suspicion of criminal activity before making a motor vehicle stop.  <u>Delaware v. Prouse</u>, 440 U.S. 648, 654 (1979); <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  In particular, the officer must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."  <u>Terry</u>, 392 U.S. at 21.  The reasonable suspicion standard means "something more than an inchoate and unparticularized suspicion or hunch," but less than probable cause and considerably less than a preponderance of the evidence.  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted).

When evaluating a seizure for reasonable suspicion, courts must consider "the totality of the circumstances — the whole picture."  <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  A collection of otherwise innocent factors may create reasonable suspicion when viewed together; no single "guilty" act is necessary.  <u>Sokolow</u>, 490 U.S. at 9-10.  The court simply assesses "the degree of suspicion that attaches to particular types of

. . . acts," and asks whether, taken together, the facts at hand justify an investigatory stop. Id. at 10. In doing so, courts are to bear in mind the inferences and deductions a law enforcement officer would make, based on his or her experience and training. United States v. Arvizu, 534 U.S. 266, 273-74 (2002).

Molodtsova argues no reasonable suspicion existed when Ingle stopped her and Hibbert as they were pulling out from the Comfort Inn. Paper 64 at 4; Paper 171 at 4-5. Accordingly, Molodtsova believes the physical evidence and statements that resulted from the stop should be suppressed. Paper 171 at 4-5.

This Court has no difficulty concluding reasonable suspicion existed for Ingle to stop Molodtsova and Hibbert. Hamblin received a call from a manager at the Hampton Inn, who told him that Molodtsova and Hibbert had a bag full of cash, were avoiding the security cameras at the hotel, and would not allow maid service in their room. This description certainly would raise suspicion for an experienced police officer like Hamblin.

Molodtsova challenges the hotel manager's phone call, arguing that without investigation and corroboration by Hamblin, it was insufficient to establish reasonable suspicion. Paper 171 at 4-5. Information from third parties must come from a "reliable person" and have underlying circumstances suggesting it is "probably accurate," in order to establish probable cause.

8

United States v. Canieso, 470 F.2d 1224, 1229 (2d Cir. 1972).
While reasonable suspicion is a lower threshold than probable
cause, similar concerns with reliability apply.  See, e.g.,
United States v. McLeroy, 584 F.2d 746 (5th Cir. 1984) (noting
that without any indication of reliability, information from a
third party may not create reasonable suspicion).  Here, Hamblin
testified he knew the hotel manager personally, she was speaking
about matters within her personal knowledge and expertise, and
her description was supported by the hotel's action — asking
Molodtsova and Hibbert to leave.[5]  Thus, the manager's report to
Hamblin was reliable.  Molodtsova points to no facts or
circumstances that would suggest otherwise.  Accordingly, the
Court finds the manager's phone call sufficiently reliable, and
its contents provide sufficient support for reasonable suspicion.

Other factors contributed to Hamblin's suspicion that
Molodtsova and Hibbert were involved in criminal activity.  The
Dodge was registered to neither of them, and Hamblin thought
Hibbert and the Defendant were attempting to avoid him when they
left the Hampton Inn.  Also, as an experienced police officer,
Hamblin knew at that time of year few tourists with Massachusetts

---

[5] While Molodtsova testified she and Hibbert voluntarily
decided to leave the Hampton Inn because it was too expensive,
the Court declines to credit this account, and Molodtsova
acknowledges they were asked to leave in her supplemental filing.
See Paper 171 ¶ 4.

plates pass through Ardmore, and that Ardmore is a popular stop for drug couriers traveling between Dallas and Oklahoma City.

Viewing all these factors together, the Court concludes Hamblin had adequate grounds for reasonable suspicion.

Hamblin's reasonable suspicion may be imputed to Ingle, who made the actual stop.  The order to do so came from Hamblin.  See United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

Because reasonable suspicion existed, the initial stop of Hibbert and Molodtsova did not violate the Defendant's Fourth Amendment rights.  Accordingly, evidence derived from the stop is not suppressed.  Terry, 392 U.S. at 13.

B.    Search of the Car During the Initial Stop

Under the Fourth Amendment, police officers must have a warrant before conducting an evidentiary search, unless one of several exceptions applies.  Katz v. United States, 389 U.S. 347, 356-58 (1967).  Molodtsova points out Ingle did not have a warrant, and she argues no warrantless exception applies.  Paper

10

64 at 6; Paper 109 at 2.  The government argues at least one warrantless search exception applies.  Paper 168.

Under the automobile exception, a police officer need only have probable cause — not a warrant — to search an automobile. See United States v. Ross, 456 U.S. 798 (1982); United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004); see also Arizona v. Gant, 129 S. Ct. 1710, 1721 (2009) (reaffirming that the automobile exception is distinct from the search incident to lawful arrest exception).  Probable cause means facts "sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched."  Gaskin, 364 F.3d at 456 (internal quotation and citation omitted).  The automobile exception search is not limited to the passenger compartment; officers may search any area where evidence of the suspected criminal activity could reasonably be found, including within containers.  Ross, 456 U.S. at 817-24.

Here, Ingle had probable cause to believe Molodtsova and Hibbert were engaged in criminal activity when he began his search of the vehicle.  In addition to the phone call from the hotel manager, which described defendants' suspicious behavior, Ingle observed Hibbert was very nervous at the initial stop.  He also saw the bag full of banded currency in the back seat, and watched Molodtsova reach back to close it and conceal the money.

11

When Hibbert opened the trunk to look for his license, Ingle also observed numerous high-end consumer goods, such as designer shoes in their original packaging. Finally, Ingle ran his narcotics dog Ricki around the car and Ricki alerted, signaling the presence of drugs.[6] Given Ricki's reliability, the canine alert establishes strong support for probable cause. See United States v. Glover, 957 F.2d 1004, 1013 (2d Cir. 1992); United States v. Nguyen, No. 2:05-CR-130-3, 2006 WL 2260104, at *7 (D. Vt. Aug. 7, 2006). Considering all these circumstances, Ingle had probable cause to search the Dodge Charger. Therefore under the automobile exception, Ingle's warrantless search did not violate the Fourth Amendment and the evidence obtained is not suppressed.

C.    Questioning During the Initial Stop

Under the Fifth Amendment, a criminal suspect who is in custody must be advised of her rights before police questioning can occur.[7] Miranda v. Arizona, 384 U.S. 436 (1966). A suspect

_____

[6] Ingle testified that Ricki was certified by the State of Oklahoma in the detection of heroin, cocaine, marijuana, methamphetamines, and other drugs. Ingle detailed the training process, and noted he and Ricki received a performance-based award for "State Canine Team of the Year" in 2005. Between 2005 and 2007, Ingle estimated he used Ricki three or four times per week for drug detection, and Ricki had never alerted in the absence of narcotics.

[7] Specifically, "[sh]e must be warned prior to any questioning that [s]he has the right to remain silent, that anything [s]he says can be used against h[er] in a court of law, that [s]he has the right to the presence of an attorney, and that if [s]he cannot afford an attorney one will be appointed for h[er] prior to any questioning if [s]he so desires." Miranda v.

is in custody for Miranda purposes when "'a reasonable person
would [understand] himself to be subjected to restraints
comparable to those associated with a formal arrest.'"  United
States v. Newton, 369 F.3d 659, 671 (2d Cir. 2004) (quoting
United States v. Ali, 68 F.3d 1468, 1472 (2d Cir. 1995)).  To
determine when a person is restrained comparably to a formal
arrest, courts look at whether or not the detention is likely to
be temporary and brief, and whether a reasonable person in that
situation would feel "'completely at the mercy of the police.'"
Id. at 675 (quoting Berkemer v. McCarty, 468 U.S. 420, 437
(1984)).  If a suspect does not receive Miranda warnings before a
custodial interrogation, any statements obtained cannot be used
in proving the prosecution's case in chief.  See id. at 668.

    Molodtsova argues all statements she made while speaking
with Hamblin at the Comfort Inn should be suppressed, because at
that time she was in custody and did not receive Miranda
warnings.  Paper 64 at 5; Paper 171 at 5-6.  The government
argues Molodtsova was not in custody and received Miranda
warnings in any event.  Paper 77 at 7; Paper 173 at 5-7.

    The Court finds the following facts.  As Ingle was searching
the Dodge Charger, Hamblin asked Molodtsova if she would mind
stepping inside the lobby of the Comfort Inn.  Molodtsova
assented.  When Hamblin asked Molodtsova for her name, she

_____

Arizona, 384 U.S. 436, 479 (1966).

initially stated it was Christina Baker.  Next, Hamblin inquired
as to what she and the driver were doing in the area, and
Molodtsova told a story about traveling to or from Miami —
similar to the driver's story, but with some differences.
Hamblin stated he did not believe her, and showed her a copy of
the ID she had used to check into the Hampton Inn.  At this point
Molodtsova admitted her real name and asked to go to the police
station to talk further.

The Court notes disagreement between the parties as to
whether Hamblin gave Molodtsova her <u>Miranda</u> warnings.  Hamblin
testified he advised Molodtsova of her <u>Miranda</u> rights after she
asked to go to the police station, and she waived them.
Molodtsova testified she did not hear the <u>Miranda</u> warnings and
did not waive her rights.  In light of the discussion below, the
Court need not resolve this factual dispute.

The parties also disagree on whether Hamblin threatened or
intimidated Molodtsova during this interaction.  Molodtsova
testified Hamblin told her at various points she was in serious
trouble, would be deported, and would not see her parents again
for a long time.  <u>See also</u> Paper 171 at 3 (alleging Hamblin
"threatened [Molodtsova] with jail and deportation if she didn't
talk to him").  The government disagrees.  Again, the Court need
not resolve this discrepancy.  Even if the Defendant believed she
was threatened and did not feel free to leave, the Second Circuit

14

has clarified that more is required for <u>Miranda</u> custody. "The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing <u>Miranda</u> custody. The 'ultimate inquiry' for determining <u>Miranda</u> custody . . . is . . . 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>Newton</u>, 369 F.3d at 670 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)). Formal arrests generally involve being handcuffed, placed in a squad car, and transported to a jail. In order to find <u>Miranda</u> custody without any of these external restraints, it must be very clear that the suspect is being detained; in spite of the ostensible freedom, the suspect's "movements [must be] totally under the control of the police." <u>Id.</u> at 676.

Here, considering "all the circumstances presented," <u>id.</u> at 677, the Court finds Molodtsova was not in custody while in the hotel lobby. She agreed to accompany Hamblin inside the hotel and was not handcuffed or otherwise restrained during the conversation. <u>See</u> <u>United States v. Titemore</u>, 437 F.3d 251, 260 (2d Cir. 2006) (finding no custody where suspect voluntarily stepped outside to speak with officer, and "was never placed under arrest , nor restrained in any way"); <u>Newton</u>, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."). The hotel lobby was a public place, and there

15

was only one officer present.  See United States v. Zaleski, 559
F. Supp. 2d 178, 189 (D. Conn. 2008) ("Courts are generally more
likely to find interrogation to be non-custodial when it takes
place . . . in public, rather than at a police station."),
Hamblin did not explicitly tell Molodtsova she was free to leave,
but he also never told her she could not leave, or that she was
under arrest.  See United States v. Falso, 293 F. App'x 838, 839
(2d Cir. 2008) (summary order) (finding no custody where, among
other things, suspect "was not told that he could not leave").
Even assuming Hamblin's warning intimidated Molodtsova and
implied she could be detained or deported in the future, the
Court finds the situation simply did not rise to the level where
Molodtsova's "freedom of action [was] curtailed to a degree
associated with formal arrest."  Newton, 369 F.3d at 672.

Because Molodtsova was not in custody while in the Comfort
Inn lobby, any statements made at that point are not suppressed
for lack of Miranda warnings.  Miranda, 384 U.S. 436.

D.   Questioning at the Police Station

Molodtsova also argues the statements made at the Ardmore
police station should be suppressed.  Paper 68 at 2, 5.  Three
issues arise with respect to Molodtsova's interview at the
Ardmore police department: whether she was in custody, whether
the warnings were actually given, and whether she waived her
rights.

16

Concerning the issue of custody, the facts are as follows. Molodtsova was not handcuffed on her way to the Ardmore police station in the rear of Hamblin's unmarked police cruiser. At the station, Hamblin and Molodtsova met Craig Overby, an agent with the FBI, and Overby interviewed Molodtsova in Hamblin's office. Molodtsova was unrestrained during the interview: she was neither handcuffed nor told she could not leave. Hamblin and Overby testified that Molodtsova was helpful and eager to cooperate. At the end of the interview, Hamblin typed up a statement which Molodtsova signed. Molodtsova did not testify that Hamblin or Overby threatened or intimidated her during the ride to or at the station.

These facts do not indicate Molodtsova was in custody during the interview at the Ardmore police station. Newton, 369 F.3d at 668-78. Although the conversation took place at the police station, the Supreme Court and Second Circuit have made clear that this alone does not suffice to create custody. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977); Newton, 369 F.3d at 671. Where a suspect voluntarily comes to the police station for an interview, and no other circumstances indicate restraint in the degree associated with a formal arrest, Miranda custody is not established simply by an interview taking place at the station. Beheler, 463 U.S. at 1123-25.

Furthermore, the Court need not decide whether Molodtsova was in custody, because even if she was, the Court finds she received <u>Miranda</u> warnings prior to the interview.  At the suppression hearing, Hamblin and Overby credibly testified that before questioning began, Hamblin read Molodtsova her <u>Miranda</u> rights from a card on his desk.  While Molodtsova testified she was never read her rights, the Court finds this testimony self-serving and not credible.

Given that Molodtsova received her <u>Miranda</u> warnings before the interview, the final issue is whether she effectively waived her rights.  "The burden rests on the government to show that after being informed of his or her constitutional rights, the accused made a knowing and voluntary waiver of those rights." <u>Nguyen</u>, 2006 WL 2260104, at *9 (citing <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995)).  Knowledge in this context means "a full awareness of the right being waived and of the consequences of waiving that right."  <u>Jaswal</u>, 47 F.3d at 542. Voluntariness means the absence of police coercion or overreaching.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986). It does not constitute coercion or overreaching, however, for police to remind a suspect that cooperation can help her. <u>Jaswal</u>, 47 F.3d at 542.

The government must prove a waiver of <u>Miranda</u> rights by a preponderance of the evidence.  <u>Connelly</u>, 479 U.S. at 168.  While

a signed document is helpful in proving waiver, witness testimony describing the suspect's verbal waiver suffices.  See, e.g., Nguyen, 2006 WL 2260104, at *10.

Here, Overby and Hamblin both testified that after Hamblin read her Miranda rights from the card on his desk, Molodtsova verbally indicated she understood her rights and wished to waive them.  Molodtsova testified that if she had understood her rights fully, she would not have proceeded with the interview.  The Court credits Overby and Hamblin's testimony, and finds Molodtsova knowingly and voluntarily waived her Miranda rights.

Because Molodtsova received Miranda warnings and effectively waived her rights, the government did not violate the Fifth Amendment by interviewing her at the Ardmore police station even if she was in custody at that time.  Miranda, 384 U.S. 436. Accordingly, statements from the interview are not suppressed. Wong Sun v. United States, 371 U.S. 471 (1963).

E.    Search of the Car in Towing Yard

In her first brief, Molodtsova argues that a subsequent search of the white Dodge Charger, which took place at a towing yard nine days later, violated the Fourth Amendment as a warrantless search and seizure.  Paper 64 at 6.  The brief states: "Th[is] search cannot be justified as an inventory search -- it was a search for investigatory purposes." Id.  No factual or legal analysis is provided, however, and Molodtsova's later

filings do not pursue this argument.  <u>See</u> Paper 109, Paper 171.
Without further elaboration, Molodtsova's one-sentence mention of
the towing yard search is insufficient to present an argument.
Fed. R. Cr. P. 47(b) ("A motion must state the grounds on which
it is based . . . ."); <u>see also</u> <u>Pelfresne v. Vill. of Williams</u>
<u>Bay</u>, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails
to press a point by supporting it with pertinent authority . . .
forfeits the point.").  The Court accordingly declines to address
the issue.

> F.    <u>Questioning in Boston</u>

Molodtsova's first brief similarly mentions an interview by
federal agents in Boston, arguing a Sixth Amendment violation due
to lack of counsel.  Paper 64 at 6-7.  Later briefs contain no
further development of this argument, nor was any relevant
testimony presented at the suppression hearing.  The Court
assumes Molodtsova is not pursuing this issue, and declines to
address it.  <u>Pelfresne</u>, 917 F.2d at 1023.

> G.    <u>Surveillance Tapes from Wal-Mart</u>

Finally, Molodtsova argues certain evidence obtained later
in the investigation — surveillance tapes from various Wal-Mart
stores — should be excluded as fruits of prior unlawfully
obtained evidence.  Paper 64 at 7.  Because the Court has found
no constitutional violation to form the basis of the "fruit of
the poisonous tree" doctrine, this argument is rejected.  <u>See</u>

<u>United States v. Andino</u>, 343 F. App'x 714, 717 (2d Cir. 2009)
(summary order).

III. <u>Conclusion</u>

For the foregoing reasons, Molodtsova's Motion to Supplement
Record (Paper 170) is GRANTED and the Motions to Suppress (Papers
64 and 109) are DENIED.  This case will be placed on the March
30, 2010 trial calendar.

Dated at Brattleboro, in the District of Vermont, this 25th
day of February, 2010.

<u>/s/ J. Garvan Murtha</u>
Honorable J. Garvan Murtha
Senior United States District Judge